## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Justin Robertson, Lauren Robertson, National Senior Benefits Services, LLC, | Case No. 21-cv-2236 (SRN/ECW) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Government Personnel Mutual Life Insurance Company, | |
| Defendant. | |

Adina R. Bergstrom and Brenda M. Sauro, Sauro & Bergstrom, PLLC, 988 Inwood Avenue North, Oakdale, MN 55128, for Plaintiffs.

Michael J. Steinlage and Nicholas A. Rauch, Larson King, LLP, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Dismiss [Doc. No. 8] filed by Defendant Government Personnel Mutual Life Insurance Company ("GPM Life"). Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** in part and **DENIES** in part the motion.

## I.    BACKGROUND

### A.    The Parties

Plaintiffs Justin and Lauren Robertson (together, the "Robertsons") are individuals who reside in Minnesota. (Compl. [Doc. No. 1] ¶¶ 1-2.) Plaintiff National Senior Benefit

Services, LLC is a Minnesota company with a registered address in Andover, Minnesota. (*Id.* ¶ 3.)

Defendant GPM Life is a Texas corporation with a registered address in San Antonio, Texas. (*Id.* ¶ 4.)

### B.    Factual Background

#### 1.    The Parties' Businesses

The Robertsons are independent insurance agents who sell policies for various insurance companies. (*See id.* ¶¶ 1-2.) As part of their business, they enter contracts with other insurance agents, referred to as "Downline Agents." (*See id.* ¶¶ 12, 22.) These Downline Agents are independently "sourced, trained, and retained" by the Robertsons. (*Id.* ¶ 22.) When recruiting the Downline Agents and otherwise conducting business, the Robertsons have used the assumed name of "National Senior Benefit Services." (*See id.* ¶ 47; *see also* Declaration of Adina Bergstrom [Doc. No. 15] ("Bergstrom Decl.") Ex. 1 at 2-3.) On February 11, 2019, the Robertsons formed Plaintiff National Senior Benefit Services, LLC, which is an independent insurance agency, through which they sell policies for multiple insurance companies. (*See* Bergstrom Decl. Ex. 1 at 4-6; Compl. ¶¶ 1-3.)

GPM Life is an insurance company that contracts with independent insurance brokers and agents, like the Robertsons, to sell its policies. (*See id.* ¶¶ 4, 7-8.)

#### 2.    The Parties' Business Relationship

In fall 2016, the Robertsons entered contracts with GPM Life to sell its insurance products as independent agents. (*Id.* ¶¶ 7-8; Declaration of Nicholas A. Rauch [Doc. No. 12] ("Rauch Decl.") Ex. A, Ex. B; Declaration of Justin Robertson [Doc. No. 16] ("J.

Robertson Decl.") Ex. A at 2-5; Ex. B at 2-5.)[1]  They became agents "for the purpose of soliciting applications and serving business in states where [they were] licensed and appointed by GPM Life." (Agent Contract § 1.2.)  As independent agents, the Robertsons were not employees of GPM Life.  (*Id.* § 1.3; Compl. ¶ 10.)  GPM Life assigned its Vice President of Senior Life Products, Mr. Mike Nash, to oversee the Robertsons.  (Compl. ¶ 21.)

### a.      The Agent Contract

The Agent Contract outlined certain duties and responsibilities of the parties. (Agent Contract § 2.)   The Robertsons agreed to "[p]rocure applications and service business in states, and for lines of business, for which [they were] licensed and appointed." (*Id.* § 2.1.)  They were also "authorized to recommend the appointment of [other agents] to market the products and services of GPM Life."  (*Id.* § 1.4.)  Likewise, GPM Life had the authority to assign agents to the Robertsons.  (*See id.* § 2.8.)  And the Robertsons could accept "responsibility for the supervision, conduct, and activities of any Agent assigned to [them]."  (*Id.*)  The Agent Contract did not confer any exclusive rights to the assigned agents, nor did it give the Robertsons exclusive authority to terminate assigned agents' contracts.

---

[1]      The Agent Contract for Justin Robertson is in the record as Exhibit A to the Rauch Declaration and on pages 2 through 5 of Exhibit A to the Justin Robertson Declaration. The Agent Contract for Lauren Robertson is in the record as Exhibit B to the Rauch Declaration and on pages 2 through 5 of Exhibit B to the Justin Robertson Declaration. For purposes of this motion to dismiss, the agent contracts are the same in substance and, therefore, the Court will simply cite to the "Agent Contract."

The Agent Contract also outlined compensation.  (*Id.* § 4.)  It provided as follows:

> GPM Life will pay you for a) all services rendered by You as a selling Agent, and b) for all services rendered by Agents (if any) contracted by You, and c) for all supervisory services (if any) rendered by You, commissions and fees as provided in the 'Commission Rates Sheet' portion . . . resulting from applications written by and received from You and bearing Your name, or the name of the Agent (if any) contracted by You, as the selling Agent.

(*Id.* § 4.1.)   In addition, the Robertsons could earn "Supervisory Commissions" for "business written by Agents assigned to [them]."  (*Id.* § 4.2.)  These were calculated based on various commission rates applicable to the Robertsons and the assigned agents.  (*Id.*; Compl. ¶ 14.)

The Agent Contract provided for an "Account Balance."  (*Id.* § 5.)  An Account Balance refers to "the sum of all amounts You owe to GPM Life, including but not limited to advances of commission to You, advances of commissions to Your sub-agents which You agree to repay but have not repaid, charges for supplies, and charges against which there is no current Compensation to offset."  (*Id.*)

Similarly, the Agent Contract contemplated "Indebtedness."  (*Id.* § 6.)  Indebtedness includes compensation overpayment, miscellaneous charges, and repayment of unearned commissions.  (*Id.*)  By signing the Agent Contract, the Robertsons "guarantee[d] to repay all Indebtedness" incurred by themselves or "any agent assigned" to them.  (*Id.* §§ 6, 6.1.)  They further agreed that "[a]ny Compensation due under this contract may be applied to reduce any Indebtedness [they] may owe to GPM Life."  (*Id.* § 6.2.)

The Agent Contract provided for termination without cause.  (*Id.* § 8.1.)  Both parties reserved the right, upon 30 days' written notice, to terminate the Agent Contract

without cause.   (*Id.* § 8.1.1.)   Such termination triggered other clauses impacting

compensation, as follows:

> 9.1.1 Earned commissions will continue in accordance with the Vesting portion of the Commission Rates Sheet applicable to the inforce policy.
>
> 9.1.2 Any bonus or incentive, as defined in subsection 4.5 will stop upon termination of this Contract.
>
> 9.1.3 The Annualization Agreement, if any, will terminate immediately and no further advance of commission payments will be made.
>
> 9.1.4 If Your Account Balance, as defined in section 5, is negative, it is immediately due and payable.

(*Id.* § 9.1.)

The Agent Contract incorporated the "Annualization Agreement."   (*Id.* § 9.1.3.)

Signed on the same day that they signed the Agent Contract, the Robertsons agreed to the

"Annualization Repayment Agreement for Agents(cies) with Recruiting Authority"

(hereinafter, "Annualization Agreement").   (J. Robertson Decl. Ex. A. at 12, Ex. B. at 17.)

Pursuant to this document, the Robertsons understood that "one or more agents will be

assigned to the undersigned for supervision and training" and that they assumed

"liability . . . for the Account Balances of such agents."   (*Id.*)   Directly above the signature

line, the document provided, "[m]y signature constitutes a) request for advancement of

commissions to me and to agents assigned to me, and b) a premise [sic] to pay their Account

Balances."   (*Id.*)   Both Mr. and Mrs. Robertson signed as individuals rather than as a

"Corporation or a Limited Liability Company," which was an available option.   (*Id.*)

Incorporated into the Annualization Agreement was the "GPM Life Annualization

Plan Agreement," (*id.*), which specifically described how GPM Life "annualize[d]

commissions and advance[d] a portion of annualized commissions" to the Robertsons.  (J. Robertson Decl. Ex. A at 8-9, Ex. B. at 13-14.)  This document provided that "[a]ll GPM Life compensation can be applied to your account balance."  (*Id.* Ex. A. at 9, Ex. B. at 14.)  It also provided that "[t]he amount of your cash advances plus other charges (your account balance) constitutes an Indebtedness to GPM Life, recoverable as provided herein, and in the [Annualization Agreement]."  (*Id.*)

### b.    Initial Success

The Robertsons enjoyed initial success as independent agents selling insurance on behalf GPM Life.  (*See* Compl. ¶¶ 25-26.)  For example, Mr. Robertson was "the top producing agent" in both 2017 and 2018.  (*Id.*)  And the Robertsons were able to grow their business by entering contracts with additional Downline Agents.  (*Id.* ¶¶ 23, 26.)  One of the Downline Agents was named Cesar Rodriguez.  (*Id.* ¶ 24.)

### c.    Alleged Wrongful Interference

This success was short-lived due to GPM Life's alleged wrongful interference.  In late 2018, GPM Life allegedly began interfering with the Robertsons' contractual relations with their Downline Agents.  (*See id.* ¶¶ 27-29.)  For example, Mr. Nash instructed Mr. Robertson to terminate Mr. Rodriguez, even though he had been one of their "top producing Downline Agent[s]."  (*Id.* ¶ 27.)  Then, after a June 2019 work trip, Mr. Nash began demanding that Mr. Robertson terminate other Downline Agents.  (*Id.* ¶ 29.)  At the same time, GPM Life began terminating the Robertsons' Downline Agents on its own.  (*Id.* ¶ 31.)  After the Downline Agents were terminated, GPM Life would "rehire" or "re-

contract" directly with those same agents. (*Id.* ¶ 29.) In fact, GPM Life "re-contracted" with Mr. Rodriguez after Mr. Nash demanded that the Robertsons terminate him. (*Id.*)

Terminating the Downline Agents was financially beneficial to GPM Life. (*See id.* ¶¶ 29, 31, 34.) First, GPM Life no longer had to pay the Robertsons commissions based on the Downline Agents' sales. (*Id.* ¶ 29.) Second, GPM Life could withhold any applicable commissions earned by the Downline Agents to pay off their respective Account Balances. (*See id.* ¶¶ 31, 34, 40.) However, the Robertsons' business suffered. (*See id.* ¶¶ 30, 33.) Given the terminations, the Robertsons' hierarchy of Downline Agents was destroyed, dramatically decreasing their sales. (*Id.* ¶ 30.)

On November 13, 2019, GPM Life sent a letter to the Robertsons. (*See id.* ¶ 32.) In the letter, Mr. Nash demanded that they stop selling policies for other carriers, threatened to terminate their contract "for cause," and wrongfully accused them of misconduct. (*Id.* ¶ 32.)

Then, two days later, Mr. Nash notified Mr. Robertson that GPM Life was terminating the Robertsons' contracts without cause, effective December 16, 2019. (*Id.* ¶ 33.) The letter demanded payment of $45,765.21 in debt to be repaid within 30 days. (*Id.*)

### d.   Withheld Commissions

The Robertsons also allege that GPM Life wrongfully withheld the Robertsons' earned commissions to pay their alleged debt. (*Id.* ¶¶ 34, 39-40.) As noted above, GPM Life calculated the Robertsons' debt to be $45,765.21 on November 15, 2019. (*Id.* ¶ 33.) About six weeks later, GPM Life confirmed that the debt had decreased to $37,509.17,

after applying the Robertsons' commissions to the debt.  (*Id.* ¶ 34.)  Subsequently, GPM Life ceased providing the Robertsons with timely accounting statements, despite their requests.  (*Id.* ¶ 35.)  Likewise, they failed to "timely provide tax documents" to the Robertsons.  (*Id.* ¶ 36.)

Absent these financial statements, the Robertsons endeavored to estimate their debt.  (*See id.* ¶ 39.)  They estimated that by March 31, 2021, they had repaid their debt and that GPM Life owed them $20,667.28 in unpaid commissions.  (*Id.*)  The Robertsons demanded payment, but GPM Life explained that "it was now charging Plaintiffs' accounts for Debts of Downline Agents that GPM had required be terminated including Downline Agents that GPM had rehired/re-contracted with directly."  (*Id.* ¶ 39.)  The Robertsons allege that GPM Life "changed its accounting practices with respect to Plaintiff's Debt and repayment of Debts accruing from Downline Agents."  (*Id.* ¶ 38.)  Consequently, the Robertsons have not received "any commissions rightfully owed" to them.  (*Id.* ¶ 40.)

### C.   Procedural History

On October 11, 2021, the Robertsons and National Senior Benefit Services, LLC (together, "Plaintiffs") filed the Complaint, alleging claims for breach of contract, wrongful interference with contract, tortious interference with prospective economic advantage, and breach of the duty of good faith and fair dealing.[2]  (*Id.* ¶¶ 41-60.)  Plaintiffs seek monetary relief.  (*Id.* ¶¶ 45, 50, 56, 60.)

---

[2]   Plaintiffs have voluntarily dismissed their claims for consumer fraud (Count 6), civil theft (Count 7), and conversion (Count 8).  (Pls.' Opp'n [Doc. No. 14] at 28.)  Accordingly, the Court denies Defendant's motion to dismiss these counts as moot.

In response, GPM Life filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  As to the contract claims, Defendant alleges that Plaintiff National Senior Benefit Services, LLC has no standing because (a) it was not a legal entity until 2019; (b) it was not a party to the Agent Contract; and (c) it was not a third-party beneficiary of the Agent Contract.  (Def.'s Mem. [Doc. No. 11] at 14-16; Def.'s Reply [Doc. No. 24] at 12-13.)  Regarding the Robertsons, GPM Life claims that it never breached the Agent Contract.  (Def.'s Mem. at 16-19.)  As to the interference claims, GPM Life asserts that the claims fail because the Robertsons have not plausibly alleged any factual allegations to support their conclusory and vague accusations.  (*See generally id.* at 19-23.)

## II.     DISCUSSION

### A.     Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true and views those allegations in the light most favorable to the plaintiff.  *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).  However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations.  *Id.*  In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss.  *See* Fed. R. Civ. P. 12(d). Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings," as well as statements of counsel at oral argument that raise new facts not alleged in the pleadings.  *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999) (internal quotation marks and citation omitted).

The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record."[3] *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must allege facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

### B.    Analysis

GPM Life seeks an order dismissing Plaintiffs' claims for breach of contract, wrongful interference with contract, tortious interference with prospective economic

---

[3]    For purposes of this motion, the Court has considered the Complaint, the Robertsons' Agent Contract, including the Annualization Agreement and the GPM Life Annualization Plan Agreement, and the public filings from the Office of the Minnesota Secretary of State, including the Certificate of Assumed Name and Certificate of Organization. *See Stahl v. U.S. Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss."); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526-27 (8th Cir. 2017) (explaining that a court can consider a contract even if it is "not attached to the complaint"); *Cumulus Invs., LLC v. Hiscox, Inc.*, 520 F. Supp. 3d 1141, 1153 n.5 (D. Minn. 2021) ("Public records, such as those filed with the Minnesota Secretary of State, may be considered without converting a Rule 12 motion into one for summary judgment.").

advantage, and breach of the duty of good faith and fair dealing. Each cause of action is considered in turn.

### 1.    Threshold Inquiry: Proper Party

Defendant asserts that Plaintiff National Senior Benefit Services, LLC should be dismissed as a named party to this action for any claim arising prior to February 11, 2019, because it was not a legal entity that can sue or be sued. (*See* Def.'s Mem. at 14-16; Def.'s Reply at 8-12.) The Robertsons concede that the name "National Senior Benefit Services" was an assumed name prior to February 11, 2019. (Pls.' Opp'n at 14.) However, they contend that "the formality of changing the Assumed Name to an LLC . . . was merely a continuation of the Assumed Name enterprise, thereby having no material impact on the contractual rights and obligations of the parties." (*Id.* at 15.) Alternatively, the Robertsons allege that GPM Life knew that the Robertsons operated under this assumed name and thus the subsequent legal entity should have the same contractual rights as the Robertsons. (*Id.* at 13-14, 16-17.)

"A court should dismiss a party that is not a legal entity." *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1382 (D. Minn. 1997) (dismissing "assumed name" defendant because such an entity is unable "to sue or be sued"). An assumed name "is not itself a legal entity, such as a corporation or partnership." *DeVary v. Countrywide Home Loans, Inc.*, 701 F. Supp. 2d 1096, 1104 (D. Minn. 2010). Instead, it operates as a mere "label" because it is "a marketing tool." *Id.*

Because an assumed name is not a legal entity, National Senior Benefit Services, LLC has no capacity to sue for claims arising prior to its formation on February 11, 2019.

(*See* Bergstrom Decl. Ex. 1 at 2-6.)  Likewise, because National Senior Benefit Services, LLC is not a signatory to the Agent Contract, it has no rights under those agreements.[4] (*See* Agent Contract at 5.)  And because the Complaint fails to allege that National Senior Benefit Services, LLC entered any agreements after February 11, 2019, it cannot be plausibly inferred that it is a proper plaintiff on the claims for breach of contract, breach of the implied duty of good faith and fair dealing, and wrongful interference with contract.

For these reasons, the Court dismisses Counts I, II, and IV with respect to National Senior Benefit Services, LLC.  However, it is an appropriate plaintiff for the claim of tortious interference with prospective economic advantage because the allegations giving rise to this claim arose after February of 2019.  (*See* Compl. ¶¶ 29-33, 51-56.)

## 2.   Breach of Contract

Defendant argues that the Robertsons' claim for breach of contract fails because it is not supported by particularized facts and because the Agent Contract explicitly grants them the authority to act as they did.  (Def.'s Mem. at 16-19.)

To establish a claim for breach of contract, the plaintiff must plausibly allege "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Neither

---

[4]   Alternatively, the Robertsons argue that National Senior Benefit Services, LLC was an intended beneficiary of the Agent Contract.  (Pls.' Opp'n at 16.)  However, the Complaint does not allege that National Senior Benefit Services, LLC was an intended beneficiary of the Agent Contract, and therefore, the Court will not consider that argument.

party disputes that a contract was formed and that the Robertsons performed the requisite conditions precedent.

Instead, the Robertsons allege that GPM Life breached the Agent Contract in two ways. First, they allege that GPM breached the agreement when it "us[ed] Plaintiffs to establish business for GPM," and once that business was established, they "solicited the Downline Agents to work directly for GPM, forced Plaintiffs to terminate the Downline Agents so that GPM could solicit them to work for GPM directly and then terminated its contracts with Plaintiffs" ("termination theory"). (Compl. ¶¶ 44-45.) Second, they allege that GPM breached the contract by failing to pay them certain commissions ("commission theory"). (*Id.* ¶ 45.) The Court addresses each theory below.

### a.   Termination Theory

The Court finds that the Robertsons have failed to plausibly plead a breach-of-contract claim under the termination theory. The Agent Contract does not contemplate that the Robertsons possess any contractual rights as to the Downline Agents other than to "recommend the appointment" of such agents and to be responsible for the "supervision, conduct, and activities" of agents that they agreed to supervise. (Agent Contract §§ 1.4, 2.8.) The Annualization Agreement confirms that the Robertsons simply agreed that they may be "assigned" agents for "supervision and training." (J. Robertson Decl. Ex. A at 12, Ex. B at 17.) And the Robertsons have not pointed to, nor has the Court found, any language in the Agent Contract giving them exclusive control over the Downline Agents. *Cf. Egner v. States Realty Co.*, 26 N.W.2d 464, 471 (1947) ("A principal and agent may agree as to the terms and conditions upon which the agent may employ subagents, including

the condition that subagents shall be deemed as between the parties to be the agents of the agent and not of the principal.").  To the contrary, the Agent Contract gives authority to GPM Life to assign agents to the Robertsons, (Agent Contract §§ 1.5, 2.8), and nothing in the Agent Contract requires GPM Life to receive the Robertsons' approval prior to terminating Downline Agents.

Accordingly, the Court finds that the Robertsons have failed to plausibly allege that GPM Life violated the Agent Contract under this theory.

### b.    Commission Theory

Next, the Robertsons contend that they have plausibly alleged a breach as to the commissions.  (Pls.' Opp'n at 2.)  The Court agrees.  Simply put, the Robertsons have alleged that they earned commissions and that GPM Life has failed to appropriately pay those commissions under the Agent Contract.  (Compl. ¶¶ 34, 39-40, 45.)  Drawing all inferences in favor of the Robertsons, as the Court must, this is enough to survive dismissal.

In urging a different result, GPM Life contends that there was no breach because the Agent Contract gives them authority to pay off the Robertsons' Account Balance with their earned commissions.  (Def.'s Mem. at 17-19.)  There is no doubt that the Agent Contract permits GPM Life to offset the Robertsons' Account Balance by applying their compensation, including commissions, to the debt upon termination.  (*See, e.g.*, Agent Contract § 4.1 (defining "Compensation" to include "commissions"); § 5 (defining the "Account Balance" as "the sum of all amounts You owe to GPM Life, including but not limited to . . . charges against which there is no current Compensation to offset"), § 6.2 ("Any compensation due under this contract may be applied to reduce any Indebtedness

14

You may owe to GPM Life."); § 9.1.4 (providing that "Your Account Balance . . . is immediately due and payable" upon termination); *see also* J. Robertson Decl. Ex. A at 9 ("All GPM Life compensation can be applied to your account balance.").

However, the Robertsons allege that GPM Life went beyond the terms of the Agent Contract. Specifically, they allege that GPM Life "changed its accounting practices with respect to Plaintiff's Debt." (Compl. ¶ 38.) Moreover, the Robertsons assert that they paid their debt by March 31, 2021. (*Id.* ¶ 39.) They also assert that GPM Life owed them $20,667.28 as of that same date. (*Id.*) Taking the inferences in their favor, the Robertsons have plausibly alleged that GPM Life has improperly calculated their debt under the Agent Contract and are thus in breach by failing to pay them their commissions. As such, the Court denies Defendant's motion to dismiss the breach-of-contract claim as to the commissions.

### 3. Wrongful Interference with Contract

Next, the Court considers whether the Robertsons have plausibly plead a claim for wrongful interference with an existing contract under Minnesota law. To state such a claim, a plaintiff must plausibly allege the following five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982).

In the Complaint, the Robertsons allege that "Plaintiff NSBS entered into written sales contract[s] and Confidentiality Agreements with the Downline Agents." (Compl. ¶ 47.) They then assert that GPM Life "knew of the existing contracts between Plaintiff

NSBS and its Downline Agents." (*Id.* ¶ 48.) Next, they allege that GPM Life "improperly terminated the Downline Agents and/or instructed Plaintiffs that such terminations were required, hereby interfering with Plaintiffs' contracts with its Downline Agents." (*Id.* ¶ 49.) Lastly, they assert that "Plaintiff NSBS has been damaged." (*Id.* ¶ 50.)

First, these allegations seem to only relate to Plaintiff National Senior Benefit Services, LLC, which, as outlined above, has no legal right to bring this claim.

Second, the Robertsons fail to state a claim under the third element. Under Minnesota law, a plaintiff is required to plausibly allege that the defendant caused the breaching party to *breach* its contract. *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018). Nowhere in the Complaint do the Robertsons allege that the Downline Agents breached their contracts with the Robertsons. They generally assert that GPM Life interfered with those contracts; however, Minnesota law requires a plaintiff to allege an actual breach of the contract. *See CyberOptics Corp. v. Yamaha Motor Co., Ltd.*, Civ. No. 3-95-1174, 1996 WL 673161, at *19 (D. Minn. July 29, 1996) ("Minnesota Courts have consistently ruled that tortious interference requires, as a necessary element, the breach of an existing contract."); *see also Cardiovascular Sys., Inc. v. Petrucci*, No. 21-1827, 2022 WL 2133743, at *2 (8th Cir. June 14, 2022) (affirming district court's 12(b)(6) dismissal for failure to state a claim for tortious interference with contract where plaintiff failed to identify a breach of the contract). Absent that allegation, this claim fails.

Third, there is nothing in the Agent Contract prohibiting GPM Life from ending its relationship with the Robertsons and then doing business with the Downline Agents. *Cf.*

*Cutter v. Lincoln Nat. Life Ins. Co.*, 794 F.2d 352, 357 (8th Cir. 1986) ("There was no evidence presented that plaintiff had an exclusive right to service the insurance contracts."); *Allied Fin. Services, Inc. v. Foremost Ins. Co.*, 418 F. Supp. 157, 159 (D. Neb. 1976) ("Unless restrained by contract terms which, for example, create an exclusive agency or a duty by defendant not to compete, defendant is privileged to employ other agents for the sale of its product and to compete directly with plaintiff.").

Lastly, the allegations in this case are different from the allegations in cases where insurance companies have wrongfully poached an agent's sub-agents. *See Time Ins.*, 980 F.2d at 1230. In *Time Insurance*, the Eighth Circuit explained that the parties had made an oral promise, which was subsequently ratified, that the "sub-agents would not be promoted without [plaintiff]'s approval." 980 F.2d at 1230. Because the insurance company promoted the sub-agents absent plaintiff's approval, despite this ratified oral agreement, the court affirmed the jury verdict finding that the insurance company had unjustifiably interfered with plaintiff's contracts with his sub-agents. *Id.* at 1231. Unlike *Time Insurance*, the Robertsons have not alleged that GPM Life orally agreed not to directly hire their Downline Agents.

Rather, this case is more like cases where the Eighth Circuit has found that a company can interfere with the contracts of sub-agents. *See Mathis v. Liu*, 276 F.3d 1027, 1030 (8th Cir. 2002). In *Mathis*, an agent entered an agreement with a company to solicit sales. *Id.* at 1029. The agent then entered an agreement with a sub-agent to solicit sales for the company as well. *Id.* The company eventually persuaded the sub-agent to end its relationship with the agent and contract directly with the company. *Id.* The Eighth Circuit

explained that "a party's interference with an at-will contract is 'primarily an interference with the future relation between the parties,' and when an at-will contract is terminated there is no breach of it." *Id.* at 1030 (internal quotation marks and citation omitted). However, because the contract in that case required 6-months' notice by the sub-agent to terminate the agreement, which notice was not given, thus breaching the agreement, the court affirmed the jury's finding of tortious interference. *Id.*

Here, *Mathis* is instructive. The Robertsons have not alleged that the Downline Agents breached their agreements with the Robertsons, nor have they alleged that those agreements were anything other than at-will contracts. As such, the Robertsons have not plausibly alleged a breach of their contracts with the Downline Agents, and therefore, this claim fails.

However, the Robertsons urge the Court to grant them leave to amend the Complaint. (Tr. [Doc. No. 27] 38:9-13 ("[I]f any amendments need to be done, we certainly welcome that direction from the Court because that would be an appropriate alternative to some sort of dismissal and refiling of the case.").) Under Federal Rule of Civil Procedure 15(a)(2), district courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15. The Eighth Circuit has explained that courts should deny leave to amend the pleadings "only in those limited circumstances in which undue delay, bad faith on the part of the moving partly, futility of the amendment, or unfair prejudice to the non-moving party can be demonstrated." *Roberson v. Hayti Police Dept.*, 241 F.3d 992, 995 (8th Cir. 2001). And this Court has granted leave to amend the pleadings when it needed "[m]ore information about the contract . . . to determine the viability of the tortious interference

18

[with contract] claim." *Prudential Ins. Co. of Am. v. Metrowide Grp.*, Civ. No. 08-6438 (JMR/SRN), 2009 WL 9110461, at *3-4 (D. Minn. July 16, 2009), *R. & R. adopted*, 2009 WL 9110462 (D. Minn. Aug. 10, 2009).

Like in *Prudential*, more information is needed to evaluate the plausibility of the wrongful interference claim. For example, the Robertsons do not allege the specifics of its contracts with the Downline Agents. (Compl. ¶ 22 (alleging only that they entered "Sales Contracts and Confidentiality Agreements for each Downline Agent.").) Without more details, the Court cannot plausibly infer that the Downline Agents are in breach of those agreements. *See Prudential*, 2009 WL 9110461, at *3-4 ("While the Jorgensens allege the existence of a contract, more details regarding that contract are needed to survive a motion to dismiss, including the identity of the parties to the contract, the type of contract, and the duration of the contract.") To be clear, to plausibly allege this claim, the Robertsons would need to identify the Downline Agents that are in breach of their contracts with the Robertsons, the specific conduct that GPM Life engaged in to cause the breach, and the type of contracts at issue.

Similarly, it is unclear to the Court whether the Downline Agents also had contracts with GPM Life. On the one hand, the Robertsons allege that they independently "retained" the Downline Agents. (Compl. ¶ 22.) On the other hand, the Robertsons allege that GPM terminated its own contracts with the Downline Agents and that the Downline Agents owed money to GPM Life. (*Id.* ¶ 32.)

Accordingly, the Court dismisses this claim without prejudice. Should the Robertsons move to amend the Complaint, they must provide these details and attach

copies of the contracts at issue here.  *See Clancy v. Vacationaire Estates, Inc.*, Civ. No. 18-2249 (JRT/LIB), 2019 WL 955113, at *1 (D. Minn. Feb. 27, 2019) ("It is conceivable that some of Plaintiffs' claims could survive a Motion to Dismiss if properly pled; thus, the Court will dismiss those claims without prejudice to afford Plaintiffs the opportunity to seek leave to amend.").

### 4.    Tortious Interference with Prospective Economic Advantage

The Court must also determine whether the Robertsons and National Senior Benefit Services, LLC have plausibly alleged tortious interference with prospective economic advantage under Minnesota law.  A plaintiff states a claim for tortious interference with prospective economic advantage upon plausibly pleading the following:

1. The existence of a reasonable expectation of economic advantage;

2. Defendant's knowledge of that expectation of economic advantage;

3. That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;

4. That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and

5. That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

Plaintiffs' allegations, however, seemingly confuse this claim with their claim for wrongful interference with contract.  In general, "the tort of tortious interference with prospective economic advantage is committed when a defendant interferes with a non-

contractual relationship—generally by unlawfully preventing an anticipated contract from being *formed*—while the tort of wrongful interference with a contract is committed when a defendant causes a breach of an *existing* contract." *ARP Wave, LLC v. Salpeter*, No. 18-cv-2046 (PJS/ECW), 2021 WL 168501, at *17 (D. Minn. Jan. 19, 2021) (emphasis in original).

Here, Plaintiffs' claim for tortious interference with prospective economic advantage is based on "their contracts with the Downline Agents." (Compl. ¶ 52.) Yet, as explained in *ARP Wave*, where there is an existing contract, the proper claim is wrongful interference with contract, which the Robertsons allege in Count II of the Complaint. *See ARP Wave*, 2021 WL 168501, at *17; *see also Gieseke*, 844 N.W.2d at 216-19 ("[I]t is important to recognize that a claim for wrongful interference with a contract and a claim for tortious interference with a prospective economic advantage protect different interests."). Based on the alleged facts, Count III must be dismissed.

### 5.    Breach of the Duty of Good Faith and Fair Dealing

Lastly, Defendant contends that the Robertsons have failed to plausibly plead a cause of action for breach of the duty of good faith and fair dealing. (Def.'s Reply at 16-17.) The Court agrees.

Minnesota law provides that "every contract includes an implied covenant of good faith and fair dealing." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). The Eighth Circuit has warned against treating this implied covenant as "an everflowing cornucopia of wish[ed]-for legal duties" and has explained that it

21

"cannot give rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996).

The duty of good faith and fair dealing applies in narrow circumstances, namely, it requires that "one party not 'unjustifiably hinder' the other party's performance of the contract." *Hennepin Cnty.*, 540 N.W.2d at 502. Put differently, it "prohibits a party from failing to perform *for the purpose of* thwarting the other party's rights under the contract." *Team Nursing Servs., Inc. v. Evangelical Luthern Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th Cir. 2006) (emphasis added). For example, a party breaches the duty of good faith and fair dealing by repudiating the contract for the purpose of preventing complete performance. *Wormsbecker v. Donovan Const. Co.*, 76 N.W.2d 643, 650 (1956). A party also breaches the implied duty when it voluntarily defaults for the purpose of avoiding its obligation to pay a debt. *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 449 (Minn. 1980) ("A party who has entered into an obligation to pay will not be permitted to set up his own voluntary default to defeat the same." (internal quotation marks and citation omitted)). And a party breaches the implied covenant when it conditions performance of the contract on the other party's relinquishment of other rights provided for in the contract. *See Zobel & Dahl Const. v. Crotty*, 356 N.W.2d 42, 46 (Minn. 1984) ("Crotty, however, would not permit the contractors to come onto his property to repair the defects unless they waived their lien rights.").

Here, the Robertsons have failed to state a claim for a breach of the duty of good faith and fair dealing. Rather, they have made two other types of allegations. First, they argue that GPM Life "abused its power under the contract" by allegedly poaching the

Robertsons' Downline Agents.  (*See* Compl. ¶ 59.)  Although this conduct may highlight the sometimes unsavory character of free market competition and the importance of protecting oneself in one's agreements, the Robertsons have not alleged that GPM Life poached the agents for the purpose of undermining the explicit purpose of the Agent Contract, namely, to "solicit[] applications and service[e] business in states where [they were] licensed and appointed by GPM Life."  (Agent Contract § 1.2.)  Nor do they even allege that they were hindered in such a way.  Finally, to the extent the Robertsons argue that GPM Life breached the implied duty by taking advantage of the compensation provisions in the Agent Contract and thus withholding certain commissions, (*see* Compl. ¶¶ 59, 60), such is properly a claim for breach of contract, which is alleged in Count I.

For these reasons, the Court finds that the Robertsons have not plausibly alleged a claim for breach of the duty of good faith and fair dealing.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Government Personnel Mutual Life Insurance Company's Motion to Dismiss [Doc. No. 8] is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. The Court **GRANTS** the Motion to Dismiss Counts I, II, and IV with prejudice as to Plaintiff National Senior Benefit Services, LLC;

2. The Court **GRANTS** the Motion to Dismiss Count IV with prejudice as to Plaintiffs Justin Robertson and Lauren Robertson;

3. The Court **GRANTS** the Motion to Dismiss Count II without prejudice as to Plaintiffs Justin Roberston and Lauren Robertson;

4.  The Court **GRANTS** the Motion to Dismiss Count III with prejudice as to all Plaintiffs;

5.  The Court **DENIES** the Motion to Dismiss Count I as to Plaintiffs Justin Robertson and Lauren Robertson; and

6.  The Court **DENIES** as moot the Motion to Dismiss Counts VI, VII, and VIII due to Plaintiffs' voluntarily dismissal without prejudice of these counts.

Dated: August 12, 2022

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge